Joseph AGG, Jr.; Carl P. Zauner; Dennis Johnson; Alvin Evans, Plaintiffs–Appellants, Cross–Appellees,

v.

Hon. Timothy M. FLANAGAN, Administrative Judge, Court of Common Pleas, Div. of Domestic Relations, Cuyahoga County; Hon. Lesley Brooks Wells, Court of Common Pleas, Div. of Domestic Relations, Cuyahoga County, Ohio; Hon. John F. Corrigan; Bureau of Support; Support Division, Court of Common Pleas; Donna Agg; Madorsky, Katz and Carr Co., L.P.A.; Leonard Carr, Defendants–Appellees,

Madorsky, Katz and Carr Co., L.P.A.; Leonard Carr, Defendants–Appellees, Cross–Appellants.

Nos. 87–3389, 87–3428.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1988.

Decided Aug. 25, 1988.

Sanford J. Berger (argued), Robert M. Fertel, Berger and Fertel, Cleveland, Ohio, for plaintiffs-appellants, cross-appellees.

Patrick J. Murphy, Michael D. Porkorny, Asst. Pros. Attys., Cleveland, Ohio, Joan K. Pellegrin (argued), Pellegrin & Zone, Lakewood, Ohio, for defendants-appellees.

John B. Robertson (argued), James M. Speros, Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, for defendants-appellees, cross-appellants.

Before KENNEDY and JONES, Circuit Judges, and CONTIE, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Plaintiffs brought this class action on behalf of "all male litigants" of the Cuyahoga County, Ohio family court "who are, or will be subjected to wage assignments, garnishments or wage attachments" under procedures that are claimed to violate the due process and equal protection clauses of the Fourteenth Amendment, and the Federal Consumer Credit Protection Act.

Defendants are judges (and all present and future judges) of that court, the Bureau of Support of that court and the Support Division of the juvenile division of the court; the ex-wife of one of the named plaintiffs, her attorney, and the law firm of her attorney.

The District Court granted summary judgment to defendants on all counts.

It found all damage claims stemming from the application of Ohio's then-existing procedure, and pursuant to court orders, were barred by the doctrine of judicial imunity. Injunctive relief concerning future application of the procedure would not be barred by immunity, but was rendered moot by a subsequent repeal of the statute and its replacement by new procedures. However, plaintiffs' request to vacate orders issued pursuant to the statute whose constitutionality they challenged was neither moot nor barred by immunity. As to these claims, the District Court found no violation of plaintiffs' constitutional rights. In addition, the District Court found no merit in plaintiff Joseph Agg's claim of conspiracy. Plaintiffs appeal.

Defendants Carr and Madorsky, Katz & Carr cross-appeal the District Court's denial of their motion to dismiss the case for lack of subject matter jurisdiction.

We affirm the judgment of the District Court in all respects.

### I. Subject Matter Jurisdiction

■ We turn first to the jurisdictional question raised on the cross-appeal. The cross-appellants argue that the "domestic relations exception" to federal jurisdiction precludes jurisdiction. At its core, that doctrine concerns federal jurisdiction based on diversity. The plaintiffs in this case sued under 42 U.S.C. § 1983 and claimed deprivation of federal constitutional rights. They also claimed that Ohio's procedures were contrary to a federal law, the Federal Consumer Credit Act, and thus invalid under the supremacy clause. These claims were not all so completely devoid of merit that we can say that they were added merely to obtain federal jurisdiction. Since they present substantial federal questions, jurisdiction in the District Court was therefore proper under 28 U.S.C. § 1331 or § 1343.

The cross-appellants argue that the determination of the civil rights claims necessarily required the District Court to decide whether plaintiff Joseph Agg was financially able to make the payments that the Ohio court had ordered and that such a decision resolves "state law matters within the scope of the domestic relations exception," *Hooks v. Hooks*, 771 F.2d 935, 942 (6th Cir.1985).

■ We believe that this view represents a misunderstanding shared by cross-appellants and appellants. An incorrect decision by the Ohio court does not constitute a deprivation of due process of law that the federal courts must redress. The proper course to correct a mistake is by appeal. It is only the claim that Ohio's procedures do not allow a vindication of plaintiffs' rights that states a cognizable due process violation. The resolution of that claim did not require the District Court to decide "parent-child, domestic relations or custody disputes [or] adoption matters subject to state law and state court disposition," *id.* The claim that the state's method of determining and enforcing child support is unconstitutional and contrary to federal law is not identical to a claim that a particular support order is too high. The domestic relations exception concerns the second claim; the federal courts must properly exercise jurisdiction over the first.

### II. Claims Under the Federal Consumer Credit Act

The Act generally prohibits garnishments above 25% of income, 15 U.S.C.

§ 1673. The District Court, assuming that the Act creates a private right of action, found that these attachments are garnishments for the purposes of the Act. For the purpose of our analysis of this issue, we make the same assumption. The Act makes an exception for support orders, 15 U.S.C. § 1673(b)(1)(A), which may reach 50% of income, 15 U.S.C. § 1673(b)(2)(A).[1] There is no allegation that this proportion was exceeded here. In order for the exception to apply, the support order must be issued by a court of competent jurisdiction, there must be substantial due process, and the order must be subject to judicial review.

The District Court found that these conditions were met, and plaintiffs' claims concerning the jurisdiction of the Ohio court and the availability of judicial review are wholly without merit. *See* Ohio Revised Code §§ 2301.34 ("default" defined as failure to comply with terms of support order issued by court of common pleas); 3109.07 (support orders appealable to the court of appeals). The question of whether the Ohio procedures violated[2] the Act therefore depends on whether there was substantial due process, an issue discussed below.

### III. Conspiracy Claim

■ Plaintiff Joseph Agg claims a conspiracy to deprive him of his civil rights on the part of four defendants: his ex-wife Donna Agg, her attorney Leonard Carr, Carr's law firm, and Judge Timothy Flanagan. The factual background of this claim, which is also the basis of Agg's due process claim, was summarized by the District Court:

On May 21, 1976 the Court of Common Pleas of Cuyahoga County, Ohio entered a judgment ordering plaintiff Agg to pay child support to his ex-wife, defendant Donna Agg. *The order was based on the stipulation of the parties.* Following a number of hearings on orders to show cause, plaintiff Agg was first found in contempt of court for non-payment of the ordered support in 1981. His jail sentence was suspended on the condition that he comply with the court's order to pay the support. At that time his arrearage was $20,725.

Twice in 1982 he was again sentenced to a jail term for contempt of the court's order to pay support but the jail term was again suspended on the condition that he make the required payments.

Following a hearing, Referee Basie recommended on May 9, 1983 that plaintiff again be cited for contempt of court and that any jail term be suspended if plaintiff paid before May 20, 1983. That order was adopted by Judge Flanagan on June 9, 1983. *Plaintiff filed no objections to the referee's recommendation and did not appeal Judge Flanagan's order. Plaintiff was represented by counsel throughout all proceedings.*

On July 28, 1983 the court ordered plaintiff Agg to appear and show why he should not be held in contempt of court. On October 11, 1983 defendant Carr and plaintiff Agg's attorney conferred in private with Judge Flanagan. Following this conference, plaintiff *Agg agreed to sign a voluntary wage order and a voluntary finding of contempt* with a three day suspension on the condition that he make payment. On November 8, 1983 the court issued a capias against plaintiff Agg for failure to comply with this order. He failed to present himself to the court and was arrested on January 20, 1984. He was in jail from that date until January 23, 1984.

Joint Appendix at 26–27 (emphasis added).

This conspiracy claim thus rests on a meeting held between Flanagan, Carr, and *Joseph Agg's counsel.* The meeting oc-

---

**1.** The proportion may be still greater if the person subject to the support order is not also supporting a spouse or dependent child apart from the spouse or child involved in the support order, 15 U.S.C. § 1673(b)(2)(B).

**2.** As we have noted, the challenged procedures have since been altered by legislative action. We are concerned with the provisions of the Ohio Revised Code in effect at the time the events of which plaintiffs complain occurred, and it is to those provisions that we refer here and in the discussion below.

curred while Joseph Agg waited outside. According to Agg, his counsel came out to him and urged him to sign the voluntary wage order and contempt finding in order to avoid imprisonment and he reluctantly signed for that reason. He claims that the subsequent order of imprisonment was unconstitutional and unlawful. He neglects to mention that the contempt order suspended the sentence on the condition that Agg pay $2,000.00 of his arrearage "forthwith," which he failed to do.

Like the District Court, we are unable to see how these facts can support a conspiracy claim against anyone. "A civil conspiracy is an agreement between two or more persons to injure another by *unlawful* action," *Hooks,* 771 F.2d at 943–44 (emphasis added). If Agg's claim is that he got bad advice from his attorney about whether to sign the voluntary agreement, he should sue for malpractice. Since Joseph Agg's attorney has not been sued, and there is no allegation that he was part of the alleged conspiracy, it appears that plaintiffs' theory is that the defendants conspired to deprive Agg of his constitutional rights by using Ohio law to get his money and have him imprisoned. But accepting Joseph Agg's version of events as true, it still appears that defendants Donna Agg, Carr, and the law firm were trying to enforce what they had every reason to believe was a lawful order according to established state procedures, which they were justified in also believing lawful. Judge Flanagan, of course, is absolutely immune from suit for these acts.

■ There is no allegation that defendants falsely claimed (then or at any other time) that Joseph Agg had not paid when he had.[3] There is no allegation that defendants Donna Agg, Carr, or the law firm ever misled the court in any way about Joseph Agg's actions or inaction.

■ We note the argument of Donna Agg's counsel that in addition to the difficulties she has had for some dozen years in collecting the child support due her from her ex-husband, she has now been put to the additional expense of defending this suit. We believe the conspiracy claim is so far from being based on a plausible legal theory that we order Joseph Agg to pay the attorney fees incurred in defending this appeal by defendants Donna Agg, Leonard Carr, and Mandorsky, Katz & Carr.

## IV. Equal Protection Claim

■ This is essentially a "reverse discrimination" claim, based on the disparate impact on men of Ohio's child support procedures. A facially neutral law does not violate the equal protection clause merely because it has a disproportionate impact; the disproportionate impact must be traced to a purpose to discriminate. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). There may be an unconstitutional purpose "when a neutral law has a disparate impact upon a group that has historically been the victim of discrimination," *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). The District Court disposed of this claim on the basis that "plaintiffs have shown no adverse effects upon a group that has historically been a victim of discrimination." It is a commonplace of constitutional law that groups well represented in the political process are unlikely to use that representation to their own disadvantage and that laws which seem to disfavor those groups do not require the same scrutiny from the courts as laws which disfavor "discrete and insular minorities," *See United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).

Even if we were to apply the same level of scrutiny to a statute that had a disparate impact on men as to one that had a dispar-

---

**3.** Agg does claim that they knew he could not pay, and tried to enforce the order anyway. However the determination of Joseph Agg's ability to pay was not made by them but by the court on the recommendation of the referee. Since there is no claim that defendants gave the referee or the court false information, any errors of fact made by the court cannot be ascribed to the actions of defendants. We discuss the due process aspect of this question below.

ate impact on women, we would find no discriminatory purpose in the Ohio law. It is fairly obvious that the disparate impact on men, insofar as we may characterize the law's effect in that way, is a result of the fact that men generally have higher incomes than women, and that society wants some of that income used to support their children. Ohio's interest in the support of children is an important and substantial one, and the means Ohio has chosen to accomplish that interest are closely related to its goal. Ohio, like other states, has attempted to redress the unequal burden of supporting the children of divorced parents between the custodial and non-custodial parents, according to their ability to pay. Under *Feeney*, we have no doubt that the Ohio child support procedure does not violate the equal protection clause of the Fourteenth Amendment.

### V. Due Process Claims

■ These are the heart of plaintiffs' argument. The District Court found that the due process requirements of notice and an opportunity to be heard were met by the Ohio procedure. Plaintiffs seem to claim that the wage assignment system affords them no chance to argue that they are unable to afford to pay the amounts that have been ordered. Insofar as their argument is construed this way, it is plainly incorrect. It appears that every support order was based on a referee's specific factual findings concerning the ability to pay. Plaintiffs were represented by counsel at these proceedings and could (and some did) file objections to the findings, which were ruled on by a judge. As we have noted, these rulings were subject to appellate review, Ohio Rev.Code § 3109.07. Indeed, plaintiff Carl Zauner did appeal such a ruling.

The payment orders all made it clear that a failure to pay would result in a wage assignment order. This order could be issued on the basis of an affidavit of the person to whom the support was due (typically the former wife), and without further proceedings. Plaintiffs claim, among other things, that this allows garnishment without the ability to argue that some change in circumstances has caused their failure to pay. (None of these plaintiffs contest the truth of the affidavits stating that they had not paid.) It should be clear that someone under a court order to perform some act who, for whatever reason, seeks a modification of that order, has the responsibility of seeking that modification. That is, the plaintiffs here cannot simply stop paying court-ordered support and *then* claim, without seeking modification of the support order as a constitutional challenge to a wage assignment, that they had a good reason for doing so. If their claim was that the support order was too high, it should have been raised at the time the order was issued. *See United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed. 2d 521 (1983). A *present* inability to pay may be raised as a defense to the contempt citation, but the contemnor may constitutionally be required to bear the burden of production on his ability to comply, *id.; see also Hicks v. Feiock*, —— U.S. ——, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988).

The remaining questions then concern whether the Ohio procedure which allowed a wage assignment order to issue without a hearing, but based solely on the affidavit of the party to whom the support payment was due, was in itself a violation of the due process clause.[4]

■ We note first that plaintiffs Agg and Evans signed voluntary wage assignment orders.[5] Since the wage assignments

---

4. Joseph Agg seems to argue that the fact that he never personally saw Judge Flanagan at the time of the October 11, 1983 meeting described above was a violation of due process. Agg's counsel represented him throughout those proceedings just as Agg's present counsel represented him before this Court. The judgment of this Court will not violate due process because Agg was not personally present, and we would be fully justified in treating his counsel's statements as those of Agg himself.

5. It may be true that these plaintiffs signed as a means of purging themselves of contempt, and in that sense were "coerced." But this is the same sort of "coercion" faced by a negligent defendant who settles rather than risk a more severe judgment, or a criminal defendant who

in the case of these two plaintiffs were made pursuant to these agreements rather than to the statutory procedure, they have no standing to claim that the procedure deprived them of any rights.

 The remaining plaintiffs, Zauner and Johnson, have not claimed that the affidavits that were the basis of the wage assignment were incorrect, but only that they were denied notice and a "pre-deprivation hearing." It is therefore apparent that, even if they were entitled to procedures that they did not receive, the result of those procedures would have been the same. Therefore, their relief, even if they were to prevail, would be limited to nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[6]

However, we believe plaintiffs have ignored the importance of the distinction between *pre-judgment* and *post-judgment* garnishments. The deprivation of plaintiffs' property, for Fourteenth Amendment purposes, was accomplished by the judgment, not the garnishment. That is, the plaintiffs *did* have extremely extensive pre-deprivation hearings. The judgment itself gave plaintiffs notice that their wages were subject to assignment if they did not comply. *Endicott Johnson Corp. v. Encyclopedia Press, Inc.*, 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288 (1924). While *Endicott Johnson* is over sixty years old, and there have since been many developments in society's and the Court's view of due process, we believe the case is still good law. Plaintiffs cite *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed. 2d 349 (1969), *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and

*North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) to support the requirement of another hearing before the wage assignment order can be issued. All these cases, however, concern pre-judgment garnishments. Their common theme is that it is fundamentally unfair to deprive someone of their property, or the use of their property for some period, *before* deciding that the deprivation is legally justified.

The present case concerns garnishment orders issued only after—indeed long after—a court has issued a judgment after according all parties notice, the opportunity to be heard, to be represented by counsel in a full adversary hearing, to object to findings, and to appeal. It is clear that the process by which the judgments were delivered was constitutional. Plaintiffs were under a legal obligation to hand over their property pursuant to those judgments. They had actual notice of the consequences of their failure to do so. When the court had grounds to believe they were violating that legal obligation, it could, consistently with the Constitution, take steps through the transfer of their property to force them to comply.

### VI. State Claims

 The District Court declined to exercise jurisdiction over Joseph Agg's pendent state claims. This decision was correct. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (state claims should be dismissed if federal claims are dismissed before trial).[7]

Accordingly, the judgment of the District Court is AFFIRMED.[8]

---

chooses to plead guilty rather than to put the government to its proof.

**6.** The total amount due from plaintiffs would have been the same even if the wage assignment order had issued later. Therefore this is not analogous to the more typical "pre-deprivation hearing" claim, which involves the termination of wages and other benefits. We express no opinion as to the remedy appropriate in those cases.

**7.** We also affirm the District Court's dismissal of plaintiffs' Eighth Amendment claims. Even if

that Amendment had application outside the criminal context, a three-day jail sentence, which could be ended by complying with a court order, seems neither barbaric nor so out of proportion to the cause of its imposition as to be "cruel and unusual."

**8.** We do not necessarily disagree with the analysis of the dissent on the issue of claim preclusion. However, this is an affirmative defense which does not appear to have been pled and which has not been advanced on appeal.

CONTIE, Senior Circuit Judge, dissenting.

In my opinion, this case should be remanded to the district court for consideration of the issue of claim preclusion. Accordingly, I would not reach the merits of this case on appeal. For this reason, I respectfully dissent.

Several courts *sua sponte* have raised the issue of *res judicata* or claim preclusion despite Federal Rule of Civil Procedure 8(c) which states that a party should plead *res judicata* as an affirmative defense. *See, e.g., McClain v. Apodaca,* 793 F.2d 1031, 1032–33 (9th Cir.1986) (bankruptcy court *sua sponte* raised issue of *res judicata;* affirmed on appeal); *Minneapolis Auto Parts Co. v. City of Minneapolis,* 739 F.2d 408, 409 & n. 2 (8th Cir. 1984) (claim preclusion raised for first time on appeal; case certified back to district court to consider the effect of *res judicata* ); *Alyeska Pipeline Serv. Co. v. United States,* 688 F.2d 765, 771, 231 Ct.Cl. 540 (1982) (Court of Claims *sua sponte* raised issue of claim preclusion); *American Furniture Co. v. International Accommodations Supply,* 721 F.2d 478, 482 (5th Cir. Unit A. 1981) (*res judicata* raised *sua sponte* by court of appeals); *Hicks v. Holland,* 235 F.2d 183 (6th Cir.) (per curiam) (district court *sua sponte* raised issue of *res judicata;* affirmed on appeal), *cert. denied,* 352 U.S. 855, 77 S.Ct. 83, 1 L.Ed.2d 66 (1956). Raising the issue of *res judicata* or claim preclusion *sua sponte* in appropriate cases, "insures the finality of decisions, conserves judicial resources, and protects litigants from multiple lawsuits." *McClain,* 793 F.2d at 1032. For these reasons, courts raise *res judicata sua sponte* despite the technical pleading requirements of Rule 8(c). *See American Furniture Co.,* 721 F.2d at 482. Wright and Miller predict that as courts become increasingly concerned with their interests in forestalling repetitive litigation, this action will become more common. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4405 pp. 33–34 (1981).

Although appellees in the instant case have not pled *res judicata* as an affirmative defense, I would construe their argument before this court that the Ohio courts would have considered appellants' federal constitutional claims if presented with them as raising the issue, or I would raise the issue of claim preclusion *sua sponte.*

In *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984), the Supreme Court held that 42 U.S.C. § 1983 does not override state preclusion law and guarantee the petitioner a right to proceed to judgment in state court on his state claims and then turn to federal court for adjudication of his federal claims. *Migra* involved the preclusion of claims made by the plaintiff. Claim preclusion rules addressed to plaintiffs, however, are mirrored by preclusion rules addressed to defendants. 18 C. Wright, A. Miller, & E. Cooper, *supra,* § 4414 p. 108.

The Supreme Court has affirmed the application of preclusion or *res judicata* [1] in a context very similar to that involved in the instant case. In *Mertes v. Mertes,* 350 F.Supp. 472 (D.Del.1972), *aff'd mem.,* 411 U.S. 961, 93 S.Ct. 2141, 36 L.Ed.2d 681 (1973), an ex-husband brought a section 1983 action to enjoin enforcement, operation, and execution of a state property division statute on constitutional grounds. The plaintiff in the section 1983 action had been the defendant in the state court proceedings. He had not raised a constitutional defense in the trial court, but he did attempt to raise constitutional issues in an appeal to the Delaware Supreme Court. The Delaware Supreme Court affirmed the lower court decision and refused to consider the constitutional question because that issue had not been raised below and was not a question of such public importance as to be entertained for the first time on appeal. *Id.* at 473. The three-judge district court held that it was barred from reaching the merits of the constitutional claim by the doctrine of *res judicata. Id.* at 474. "*[R]es judicata* bars this court from litigat-

---

**1.** The Supreme Court has explained that the term *res judicata,* when used in a narrow sense, is synonymous with claim preclusion. *Migra,* 465 U.S. at 77 n. 1, 104 S.Ct. at 894 n. 1.

ing the constitutional claim now raised by Thomas which could have been litigated as a defense in the state court against the judgment that was entered in Victorine's favor." *Id.* at 475. *Res judicata* also barred litigation against defendants who were not parties in the previous action because there was a close or significant relationship between successive defendants. *Id.* In that case, the additional defendants were the presiding superior court judge and the commissioner appointed to convey the ex-husband's interest in some jointly held real estate. *Id.* at 473–74.

In *Vinson v. Campbell County Fiscal Court,* 820 F.2d 194 (6th Cir.1987), this court refused to apply claim preclusion to bar a section 1983 action. In that case, although the section 1983 plaintiff had an opportunity to litigate the issue of her allegedly false arrest and imprisonment and/or malicious prosecution and/or abuse of process at the state court hearing, her section 1983 action was not the same cause of action as the state's criminal case against her. *Id.* at 197.

The instant case is distinguishable from *Vinson* since the state court proceedings in the instant case were civil rather than criminal. *See Hicks v. Feiock,* — U.S. —, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) (holding that if the relief provided in contempt proceedings is imprisonment, it is civil contempt if " 'the defendant stands committed unless and until he performs the affirmative act required by the court's order.' " (quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911))). Therefore, the fact that claim preclusion does not extend from criminal prosecutions to civil actions, *see* 18 C. Wright, A. Miller, & E. Cooper, *supra,* § 4474 p. 748, does not prevent its application here as it did in *Vinson.* For these reasons, I would remand this case to the district court to consider the issue of claim preclusion.

Furthermore, the district court's holding that 15 U.S.C. § 1673 creates a private right of action is highly suspect. Section 1673 is part of Subchapter II of the Consumer Credit Protection Act. At least

three circuits have held that there is no private right of action under Subchapter II of this act. *See Snapp v. United States Postal Service,* 664 F.2d 1329 (5th Cir. 1982); *McCabe v. City of Eureka,* 664 F.2d 680 (8th Cir.1981); *Le Vick v. Skaggs Cos.,* 701 F.2d 777 (9th Cir.1983). *Cf. Western v. Hodgson,* 494 F.2d 379, 380 (4th Cir.1974) (expressly refusing to reach the question whether a private right of action exists because the facts of that case would not merit relief in any event). In reaching their holdings, these courts have noted that section 1676 (also part of Subchapter II) provides that " 'the Secretary of Labor ... shall enforce provisions of this Subchapter.' " *Le Vick,* 701 F.2d at 779 (quoting 15 U.S.C. § 1676).

*Ellis v. Glover & Gardner Construction Co.,* 562 F.Supp. 1054 (M.D.Tenn.1983), the case cited by the district court in support of its position, relies in part on the following reasoning: "The Sixth Circuit has at least tacitly recognized a private right of action [under Subchapter II] in remanding for further factual findings an action instituted by a plaintiff who sought reinstatement and other relief for wrongful discharge in violation of 15 U.S.C. §§ 1671, *et seq." Id.* at 1057 (citing *Nunn v. City of Paducah,* 71 L.C. § 32,890 (6th Cir.1972)). No Sixth Circuit case has addressed the issue of whether there exists a private right of action under Subchapter II of the Consumer Credit Protection Act, *cf., Smeyres v. General Motors Corp.,* 820 F.2d 782 (6th Cir.1987) (per curiam) (holding that there is no private right of action under 15 U.S.C. § 1664, Subchapter I, Part C of the Consumer Credit Protection Act), and I do not believe that *Nunn* is controlling on this issue. If this issue were squarely before the court, I would join the other circuits which hold that Subchapter II of the Consumer Credit Protection Act does not confer a private right of action.

As I have indicated above, however, this case should be remanded to the district court for consideration of the issue of claim preclusion. For the foregoing reasons, I respectfully dissent.